## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BENETTA M. MANSFIELD,<br>4025 N. Randolph Street<br>Arlington, VA 22207<br><br>    Petitioner,<br><br>       v.<br><br><br>SCOTT BLOCH, Special Counsel,<br>  Office of the Special Counsel<br>1800 M Street, N.W.<br>Washington, D.C. 20036-4505<br><br>    Respondent | )<br>)<br>)<br>)<br>)<br>)<br>) Writ of Mandamus/Rule 27 Motion<br>)<br>)   C.A. No.<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED PETITION FOR WRIT OF MANDAMUS AND MOTION TO PERPETUATE AND MAKE AVAILABLE TESTIMONY

Petitioner Benetta Mansfield, by her undersigned counsel, alleges and states as follows:

### I. INTRODUCTION AND JURISDICTION

This Petition arises from the nexus of wrongful actions by two government agencies and the death of a witness. Petitioner asks this Court for the extraordinary remedy of a writ of mandamus and an order pursuant to Rule 27 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") because of an egregious set of actions and lack of actions underlying this matter. In summary, as a result of animus against Petitioner arising out of her prior position and actions as a court-appointed officer, she filed a complaint with the Special Counsel, Office of the Special Counsel ("the OSC"). The Special Counsel allowed its investigation and prosecution to languish. Now, because of the recent death of a witness to an admission of the wrongdoer's illegal animus

towards Petitioner, that witness' sworn testimony is in the sole custody of the Special Counsel.

Despite Petitioner's request, the Special Counsel has failed to take any steps to produce that

witness's sworn testimony to Petitioner for use in future judicial proceedings.

1.   Until her death on July 2, 2005, Barbara Casey was an employee of the National Mediation

Board ("NMB").  Prior to her death, Casey gave sworn testimony to the OSC, which is currently

in that agency's possession.  Production of that statement is necessary at this time because the

OSC has, contrary to specific statutory mandates, wrongfully failed to investigate and move

forward with Petitioner's allegations for the last several months and now failed to respond to

Petitioner's requests to produce such testimony.  Its production has also now become necessary,

because with the untimely death of Casey, her testimony is the only known evidence of the

admission to Casey, by Edward J. Fitzmaurice, Member of the National Mediation Board

("NMB"), of his intent to carry out certain wrongful and illegal acts against Petitioner.  As set

forth in detail below, Petitioner, Benetta M. Mansfield, an employee of the NMB, has filed or

noted her intent to file several administrative and federal court actions against the NMB, and

chiefly, its former Chairman and Member, Edward Fitzmaurice ("Fitzmaurice"), as a result of a

series of harassing and tortious actions Fitzmaurice has taken against Mansfield which have

caused her loss of pay and performance bonuses, benefits, demotion, and extreme emotional and

physical distress.   The sworn statement of Decedent Casey contains admissions by Fitzmaurice of

his intent to take such wrongful actions.  Accordingly, immediate production of Casey's

testimony, now exclusively in the possession of the OSC, is proper to avoid a further delay in and

failure of justice.  See Rule 27(a)(3).

2. Jurisdiction lies with this Court pursuant to the All Writs Act, 28 U.S.C. 1651 (a), as well as Rule 27 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), 5 U.S.C. §§ 1212 and 1214, 5 U.S.C. §7703(a)(2) and 42 U.S.C. § 2000e-16 (c).

## II. THE PARTIES

3. Petitioner is a federal employee of the NMB. From April 4, 2002 to December 28, 2004, she was Chief of Staff, a career Senior Executive Service ("SES") position. She has been widely recognized for her skills as an attorney and manager. From September 1997 through December 1998, Petitioner served as the court-appointed Deputy Election and Interim Election Officer for the court-monitored election of the International Brotherhood of Teamsters, AFL-CIO ("IBT"). In 2001, she was selected as Transportation Lawyer of the Year by the Federal Bar Association. In March 2002, she became Chief of Staff at the NMB. In 2004, she was one of six law school alumni honored by her alma mater, Northeastern University School of Law, as "Trailblazer for the 21st Century."

4. Respondent Scott Bloch is the Special Counsel. He is the chief officer of the OSC, an independent agency with the mission of investigating and prosecuting the commission of prohibited personnel practices against federal employees as defined in 5 U.S.C. § 2302 (a) and (b). Pursuant to 5 U.S.C. §1212, the OSC is required to receive and investigate prohibited personnel practices. Among the Special Counsel's powers are the power to administer oaths, examine witnesses, issue subpoenas, take depositions, and seek stays of personnel actions from the Merit Systems Protection Board ("MSPB"). 5 U.S.C. §1212. The Special Counsel is also specifically required by statute to make a time-specific determination of whether reasonable belief exists that a

prohibited personnel practice has occurred and to take certain actions to connection with any such investigation. 5 U.S.C. § 1214(d).

## III. BACKGROUND AND HISTORY

A. PETITIONER'S ALLEGATIONS AGAINST THE NMB

5.  Petitioner contended to the Respondent OSC that particular actions and treatment of her by NMB Member Fitzmaurice have been motivated by illegal animus. Upon information and belief, that animus arises from Petitioner's court-appointed role as Deputy Election Officer and Interim Election Officer in the 1998 court-monitored rerun of the 1995 court-monitored election of the International officers of the International Brotherhood of Teamsters, AFL-CIO ("IBT"). During that rerun, Petitioner, as a court-appointed Deputy Election and Election Officer, conducted an investigation into the illegal and corrupt actions of J.D. Potter, who had been the elected to the IBT Executive Board as Vice President from the Southern region of the IBT. As a result of that investigation, she referred Potter to the Independent Review Board of the IBT, a second court-appointed body responsible for resolving alleged criminal violations of the court order. As a result of Petitioner's referral, Potter was removed from office, fined $11,000, and barred for a period of 5 years from running for union office with the IBT. Exhibit 1, Unpublished Portion of Election Officer Opinion reported at BNA on June 22, 1999.

6.  Prior to being named to serve on the NMB in August 2002, Fitzmaurice had served as Potter's counsel and personal attorney in several proceedings. Fitzmaurice was also "Of Counsel" to the law firm of James L. Hicks and Associates, which represented the IBT Local and a Joint Council, in which Potter was an officer.

7.   Petitioner left her position overseeing the IBT elections and, in March 1999,  joined the NMB

staff, serving first as Senior Hearing Officer, then as Deputy Chief of Staff and acting General

Counsel, and finally, before the actions underlying this Petition were taken, as its Chief of Staff.

8.  Petitioner contends here and did contend before the OSC that, prior to being named to the

NMB, Fitzmaurice had no direct knowledge of Petitioner in either an official or personal capacity.

Notwithstanding that fact, prior to as well as after being appointed to the NMB, Fitzmaurice

expressed his intense dislike of Petitioner to colleagues and other persons and treated Petitioner

in a humiliating and arbitrary and capricious manner.  He eventually engaged in more serious

action against her which resulted, among other adverse actions, in her demotion from the SES and

loss of pay and benefits.

9.  In the spring of 2002, prior to his being appointed to the NMB, Fitzmaurice told Barbara

Casey, who was a confidential assistant to then Board Chairman Francis Duggan, that he was

going to "get that bitch" Mansfield because of what she "did to his friend, J.D. Potter."  This

conversation took place during a car ride when Casey was assisting Fitzmaurice in identifying real

estate in anticipation of his move to Washington, D.C.   In August 2002,  Fitzmaurice was

appointed to the Board.  He selected a residence in Casey's neighborhood and they sometimes

commuted together.  During these rides, Fitzmaurice continued to make comments to Casey

reflecting his animus for Petitioner.

10.  Upon his appointment to the Board, Fitzmaurice began to make additional comments to other

persons reflecting his animus towards Petitioner.  While Fitzmaurice was certainly not tactful with

many Board employees or constituents, his treatment of Petitioner Mansfield was particularly

abusive.  Upon information and belief, his hostile treatment of Petitioner has been well

documented in various affidavits attested to by Fitzmaurice's fellow Board members, NMB

employees, constituents or other witnesses, and which have been gathered as part of NMB's Equal

Employment Opportunity ("EEO") investigation and the OSC investigation. Between August

2002 and today, Fitzmaurice continued his hostile treatment of Petitioner.

11. As a result of his personal animus towards Petitioner, from the start of his tenure with the

NMB, Fitzmaurice began a campaign to revise the Board's delegation order which provided that

the Chief of Staff manage the day-to-day operations of the NMB.[1]  The other two Board

members, then-Chairman Duggan and Harry Hoglander, refused to make such changes.

12. In July 2003, according to an annual rotation, Fitzmaurice became the Board Chairman. As

Chairman, he became Petitioner's rating official.  In November 2003, prior to his departure from

the NMB, former Chairman Duggan, who had supervised and been Petitioner's rating officer for a

9 month period of the rating period ending September 30, 2003, forwarded to Fitzmaurice his

narrative of Petitioner Mansfield's 2002-2003 performance.  The summary rating was

"Outstanding." Around the same time, Duggan's term of office at the NMB ended.  Read Van de

Water was sworn in as a Board member on December 11, 2003.

---

[1]   The NMB is a quasi-judicial independent federal agency with responsibility for resolving
disputes between and among railroads and airlines and the collective bargaining agents of their
employees. It is headed by three term-appointed members nominated by the President and
confirmed by the Senate. The three Board members can only operate through a quorum.
Traditionally, the Chairmanship of the Board rotates annually among the three Board members.
The Chairman of the Board has no power or authority than the other two Board members except
that he has usually been the designated rating officer for the Chief of Staff and the reviewing
officer for senior employees. The NMB employs fewer than 60 employees.
    Harry Hoglander was sworn in as a Board member on August 6, 2002. Fitzmaurice was
sworn in as a Board member on August 2, 2002. Read Van de Water was sworn in as a Board
member on December 11, 2003. From July 1, 2003 through June 30, 2004, Fitzmaurice was
Chairman of the Board. It is Fitzmaurice's animus and subsequent wrongful actions and the
concurrence of member Van de Water in his wrongdoing which form the basis of this Petition
and pending or yet-to-be-filed cognizable legal actions.

13. From December 2003 through December 2004, and thereafter, Fitzmaurice initiated a series of increasingly hostile actions against Petitioner Mansfield in line with his statements to Casey that he would "get" Mansfield like she "got" his friend Potter. These actions were either taken unilaterally by Fitzmaurice or assented to by Van de Water in meetings of the Board.[2] They included the downgrading of Mansfield's performance rating, a decrease in her performance bonus over the objections of a Performance Review Board, removal of all of Petitioner's substantive and administrative responsibilities as Chief of Staff, assignment to lower-graded duties, denial of access to computer files, public humiliation, detail to duties at another federal agency, and, ultimately, her removal from the SES and the abolishment of her Chief of Staff position in December 2004.

B. THE OSC COMPLAINT PROCESS

14. As a result of these actions, in April 2004, pursuant to 29 C.F.R §1614, Petitioner filed a discrimination complaint with the NMB's EEO office. Petitioner's complaint to the OSC included allegations of the commission of prohibited personnel practices in violation of various subsections of 5 U.S.C. 2302(b). In particular, her complaint (MA-04-1921), included a specific claim of reprisal by Fitzmaurice, in violation of 5 U.S.C. §2302(b)(8), (9)(A), and (b)(10), for exercising her right and obligation to investigate election fraud in the IBT's 1998 election and report suspected violations to the Independent Review Board ("IRB") in accordance with the Consent Order in U.S. v. International Brotherhood of Teamsters, 88 CIV. 4486 (DNE) (March

---

[2]    Member Hoglander was frequently not informed of these meetings or decisions until after the meeting occurred or decision was reached.

14, 1989)[3]. Petitioner identified Casey as a key witness to this allegation.

15. On September 14, 2004, the OSC referred Petitioner's complaint to its Investigative Unit for further investigation of retaliation for whistleblowing by Fitzmaurice and Van de Water in violation of 5 U.S.C. 2302(b)(8), and for investigation of her allegations of prohibited personnel practices. In particular, the OSC was interested in further investigating whether the NMB, and, more specifically, Fitzmaurice, had committed a prohibited personnel practice as a result of Petitioner's involvement in the prosecution of J. D. Potter.[4]

16. Petitioner's complaint was assigned to Career Attorney Alberto Riveria-Fournier, Supervising Career Attorney and Associate Director Carey Sklar, and Career Investigator Quentin Barrett.

17. Also on September 14, 2004, Petitioner received notice from the NMB that it was abolishing the Chief of Staff position and implementing a one-person Reduction-in-Force ("RIF") effective

---

[3]     The Consent Order was part of the settlement of the civil RICO action brought by the United States of America against the IBT. The purpose of the Consent Decree was to rid the IBT, the largest trade union in the free world, of the corrupt influence of organized crime and to establish a culture of democracy within the union. U.S. v. IBT, 39 F. Supp. 2d 397 (S.D.N.Y 1999). The Consent Decree provided that the court would appoint certain court officers, including an Election Officer, to oversee IBT elections. (Consent Decree at p. 4) Mansfield served as Interim Election Officer from September 1997 to December 1997; and Deputy Election Officer from December 1997 through December 1998, pursuant to the Consent Decree. In that capacity, she was a court-appointed election officer.

In her capacity as a court-appointed election officer, and in furtherance of the Consent Decree, Ms. Mansfield reported the allegations related to J.D. Potter to the IRB. These actions resulted in Mr. Potter's being disqualified from serving as Southern Regional Vice President of the IBT and also caused him to be disciplined under the Consent Decree by the IRB.

The Consent Decree remains in effect today, and is administered by the U.S. District Court for the Southern District of New York. Numerous persons and entities are obliged to cooperate with the Court and the IRB in connection with the administration of the Consent Decree. The court has expressly applied the terms of the Consent Decree to non-parties pursuant to the All Writs Act. See U.S. v. Int'l. Bhd. of Teamsters et al. v. Yellow Freight, 948 F.2d 98 (2d Cir. 1992).

[4]   Upon information and belief, only some twenty percent (20%) of complaints received by OSC are referred to that unit for investigation and prosecution.

November 30, 2004.

18. As a result, Petitioner amended the OSC Complaint to include additional allegations of prohibited personnel practices. She alleged that the RIF was a mere continuation of the same animus. She requested that the OSC seek a stay of the RIF from the MSPB. See 5 U.S.C. § 1214(b)(1)(A)(I).

19. In October through December 2004, the OSC appeared to be actively investigating Petitioner's allegations. The OSC career attorney and career investigator twice interviewed Petitioner.

20. Sometime in November 2004, the career attorney and career investigator interviewed Barbara Casey. At the time of her interview, Casey worked as a confidential assistant to NMB Member Van de Water.

21. Casey provided sworn testimony to the OSC that Fitzmaurice had made numerous remarks to Casey regarding his dislike of Petitioner. Specifically, Casey provided sworn testimony to the OSC that Fitzmaurice told Casey, prior to or around the time of his appointment to the NMB, words to the effect that he was going to "get" Mansfield "because of what she had done to my friend Potter." Exhibit 2, Affidavit of Francis Duggan, ¶ 3 and Attachment thereto. Casey's statement was in the form of a sworn taped deposition/interview. OSC did not provide Casey with a copy of her taped interview. *Id.*, ¶3.

22. Casey feared retaliation by Fitzmaurice and the NMB if her cooperation with the OSC investigation became known. Exhibit 3, Affidavit of Leslie B. Kiernan, ¶¶4,13; Exhibit 4, Affidavit of Michael A. Luckey, ¶5. Specifically, Casey feared that she would lose her job because of her noncareer status as Confidential Assistant to Board member Van de Water. She

had a particular fear of losing her job prior to attaining eligibility in May 2005 for immediate retirement benefits. See Exhibit 3 at ¶13.

23. Because of Casey's fear, with the knowledge and assent of Petitioner, the career members of the OSC conducted their investigation in a manner designed to not prematurely expose Casey to the risk of retaliation before her May retirement eligibility date.

24. In early November 2004, on behalf of the Special Counsel, OSC Career Attorney Rivera-Fournier sought an informal stay of the NMB-proposed RIF action. On or about November 17, 2004, the NMB refused to voluntarily grant such a stay.

25. In or around December, 2004, the OSC career attorney began drafting a request to seek a formal stay from the MSPB of the RIF action of Petitioner pursuant to 5 U.S.C. § 1214(b)(1) (A). Rivera-Fournier indicated to Petitioner that the OSC would not formally file the request until shortly after the New Year in order to not exhaust the initial statutory 45 day stay period with the Board during the holiday period. Id.

26. On or around January 5, 2005, the NMB informed Petitioner by written notice that her position was abolished in a RIF, she was removed from the SES and was being demoted effective December 27, 2004.

27. After preparing the OSC request for the stay of the RIF, Rivera-Fournier's career supervisor Sklar approved it. It was then presented to the Special Counsel for his review. In January and early February, the Special Counsel sought revisions which Rivera-Fournier prepared during and around the first week of February. The Principal Legal Advisor to the Special Counsel, James McVay, a political appointee, discussed these proposed revisions with Petitioner's counsel.

28. In the meantime, on or around January 6, 2005, Special Counsel Bloch announced the

involuntary geographic reassignment of twelve career employees, including Sklar and Rivera-Fournier, the two attorneys handling Petitioner's case.

29.  In late January or early February 2005, Casey was diagnosed with terminal cancer. Petitioner, through Counsel, advised the OSC of Casey's illness.

30.  On February 17, 2005, in response to several telephone messages left for Special Counsel Bloch and his deputies, the Special Counsel's Principal Legal Advisor James McVay telephoned Counsel to the Petitioner.  Petitioner learned, for the first time and without explanation, that the OSC would not seek a stay from the MSPB.  In response to Petitioner's objections and concerns, McVay indicated that Mansfield's case would be on the "fast track" or "priority" list of cases.  In a bizarre turn of events, Petitioner's counsel was actually the person who first informed Attorney Rivera-Fournier of this new and unexplained decision by the Special Counsel.

31.  Around that time, Petitioner was informally told by the two career attorneys handling the case that they were leaving the OSC because of the proposed  geographic reassignments.  Rivera-Fournier's last day was March 11, 2005.  Sklar left the OSC on March 18, 2005.

32.  In the meantime, Casey was receiving chemotherapy treatments.  However, in response to that treatment, Casey suffered complications and was hospitalized for most of the months of May and June and in intensive care.

33.  Prior to being admitted to the hospital for the last time before her death, Casey told Duggan that she would be willing to be deposed by subpoena for purposes of perpetuating her testimony. On July 2, 2005, before any such deposition could occur, Casey died.  Exhibit 1, ¶6.

34.  The third and final staff member assigned to Petitioner's OSC case, Investigator Barrett, left the OSC on July 8, 2005.

35. According to a "60 day status update" letter from Barrett, OSC's investigation into Petitioner's allegations remain in an ongoing status. Exhibit 5, Letter of Quentin Barrett, Investigator, OSC, dated July 8, 2005.

36. Notwithstanding such notification, no OSC staff have been assigned to Petitioner's case. Exhibit 6, Letter of Ronald K. Jaicks, Supervisory Attorney, OSC, dated July 19, 2005. The OSC has entirely failed to reach to reach the required statutory determination of whether there are "reasonable grounds to believe that a prohibited personnel practice has occurred, exists, or is to be taken." See 5 U.S.C. §1214.

37. Petitioner's allegations of her pre-RIF prohibited personnel practices can only move forward to the MSPB if the OSC initiates proceedings at the MSPB.

38. On July 7, Petitioner OSC requested that the Special Counsel perpetuate and provide her with Casey's testimony. Exhibit 6, Letter from Petitioner's Counsel, dated July 7, 2005. Petitioner has obtained and provided the Special Counsel with a copy of a sworn statement from Casey's son, and personal representative for her estate, that it was Casey's desire that her statement would be released to Petitioner. Exhibit 6, Letter from Petitioner's Counsel to Special Counsel dated 7/12/03; Exhibit 3, Luckey Affidavit.

39. OSC has neither responded to Petitioner's request that the OSC perpetuate Casey's testimony and nor provided her with a copy of it.

40. All Petitioner has received from the OSC is the letter from Supervisory Attorney Jaicks stating that "your matter is in the process of being assigned to another investigator." Exhibit 6. In response to Petitioner Counsel's call to Jaicks on July 20, 2005, Jaicks left a message that he "knew nothing" about Petitioner's letters to the Special Counsel.

41. OSC has never sought from or reached agreement with Petitioner that it should continue its investigation beyond the 240 day time limits as required by statute. 5 U.S.C. § 1212(b)(2)(A)(ii). With the loss of the OSC's investigatory and prosecutorial staff, Petitioner has no way of knowing how long the OSC investigation will languish.

42. As of the current date, Petitioner has concluded that the OSC has no intention to meet its statutory obligations. OSC's inaction and failure to timely investigate and timely and effectively prosecute Petitioner's allegation regarding Fitzmaurice's animus against Petitioner as a result of her actions as a court and IBT election officer against his friend and associate J.D. was a violation of its statutory duty. Its failure to ensure perpetuation of Casey's testimony for Petitioner's use now poses a direct risk to Petitioner's ability to effectively prosecute on her own the allegation of Fitzmaurice's illegal and wrongful animus and actions against Petitioner.

43. Absent court intervention, Petitioner has no other means to ensure preservation and production of the sworn statement taken by the OSC investigator from Casey other than to ask this Court to direct the Special Counsel to perpetuate that interview and provide Petitioner an authenticated copy of Casey's sworn testimony use by for this Court and other courts and quasi judicial agencies' use in future proceedings.

44. Petitioner accordingly seeks that the Court order OSC to preserve and provide an authenticated tape of Casey's testimony to Petitioner.

45. Absent an expedited Court order requiring the OSC to perpetuate and produce Casey's testimony, Petitioner may be precluded from introducing the direct evidence of Fitzmaurice's admission to Casey against interest and this particularly powerful evidence of his animus towards Petitioner – his specifically expressed admission of his intent to "get" Mansfield because of her

role in "getting" J.D. Potter, Fitzmaurice's friend and former client, barred from Teamster office and fined, in an administrative or judicial proceeding.

46. Requiring a federal investigatory agency to make immediately available the sworn testimony of a decedent witness that the government official of a second agency retaliated against Petitioner, a highly regarded federal employee, on account of the latter's former role and actions as a court-appointed elections officer undoubtedly serves the purposes of the Rule.

WHEREFORE, given the failure of the OSC to adequately discharge its duties in investigating and prosecuting this case and its failure to produce Casey's statement to Petitioner for use in judicial and quasi-judicial proceedings to be filed or refiled by Petitioner, pursuant to Fed R Civ.P. 27, the All Writs Act, and the equitable power of this Court, Petitioner respectfully requests that this Court order OSC and the Special Counsel to preserve, perpetuate, and produce the original and/or authenticated copy of Ms. Casey's testimony before the OSC to this Court for its examination and to provide it to Petitioner for use in proceedings to which she is or will be a party.

I certify under the penalty of perjury that the foregoing is true and correct.

Executed on this 25th day of July, 2005.

Benetta Mansfield

Beth S. Slavet

Respectfully submitted,

Beth S. Slavet, D.C. Bar 305805
Jonathan G. Axelrod, D.C. Bar 210245
Counsel for Petitioner
Beins, Axelrod, Kraft, Gleason and Gibson, P.C.
1717 Massachusetts Avenue, N.W., Room 704
Washington, D.C. 20036

July 25, 2005

15

<u>Exhibit # 1</u>

**Beth Slavet**

**From:** "Mansfield, Benetta" <Mansfield@nmb.gov>
**To:** <bslavet@bakgg.com>
**Sent:** Monday, April 19, 2004 11:28 PM
**Subject:** JD_Potter____Excerpt_from_Post_65_EOH[1]

2.    <u>James D. Potter</u>

Mr. Potter was a successful candidate for Southern Region Vice President on the Hoffa Slate. On December 15, 1998, the IRB sent proposed charges against Mr. Potter to Acting General President Sever. The IRB proposed that Mr. Potter should be charged with lying under oath to the IRB and the Election Officer concerning the source of funds for contributions made to the Hoffa Campaign in the International Officer rerun election. The IRB summarized the pertinent facts in the proposed charge:

> Potter originally sent a $10,000 contribution to James Hoffa ("Hoffa") in response to an explanation from an official of the Hoffa Campaign that $10,000 was needed to be on the slate. The Election Officer had imposed a $5,000 contribution limit in the rerun election. The check was returned. Potter then sent in a $5,000 check and a cashier's check purchased with $5,000 from his account to Hoffa. Potter said that the cashier's check represented contributions of $1,000 from five Local 19 members which was reported on the Hoffa Rerun CCERs. All five members testified they gave Potter $1,000 in cash. Two individuals, who made approximately $20,000 a year, testified that this $1,000 came from money kept at their homes. Potter testified in a joint IRB-Election Officer sworn examination that he took the money gathered within two days from the five members and placed it in an envelope which he had kept continuously in his car trunk. He used $300 of this money but the remaining $4,700 was still in the trunk untouched. An IRB Investigator went with Potter to the car and Potter retrieved the envelope. The bills, totaling $4,700, were photocopied. The bills' serial numbers were forwarded to the United States Treasury Department to ascertain the dates of their printing and distribution into public circulation. According to the Treasury Department, three bills had not been shipped from the Bureau of Printing and Engraving at the time Potter said he placed the money in the trunk. Four Federal Reserve Banks have reported that at least ten other bills were not in circulation at the time Potter claimed he received the cash and put it in his trunk. It appears that Potter lied under oath to the IRB and the Election Officer concerning a matter relevant to their duties under the Consent Order.

These facts have not been the subject of any prior Election Office proceeding. Indeed, as the IRB proposed charges note, the facts were gathered in the course of a joint investigation by the IRB and the Election Officer. Accordingly, the Election Officer will review the facts and determine whether a *Rules* violation is shown and, if so, what remedy may be appropriate.                    Attachment 5

a.    Finding Concerning Mr. Hoffa and the Hoffa Slate

The essence of the allegation is that Mr. Potter violated the court-approved limit on campaign contributions and then concealed that violation by falsely reporting the source of the excess contribution. As a preliminary matter, the investigation found no facts to indicate that Mr. Hoffa, or anyone at the Hoffa Slate's headquarters, had any role in the alleged misconduct. To the contrary, the facts show that when Mr. Potter exceeded the limit by contributing $10,000 of his personal funds to the campaign, Hoffa Slate representatives informed Mr. Potter of the operative limits and returned the improper check. The facts further show that when Mr. Potter sent the Hoffa Slate his personal check for $5,000 and the $5,000 cashier's check, the latter was found with a handwritten list identifying five IBT members (with social security numbers) as the source of the cashier check funds. Thus, from the Hoffa Slate's perspective, the contribution appeared proper on its face. The Hoffa Slate CCER reported the cashier's check as five individual $1,000 contributions in accordance with the information it had received. Accordingly, there is no basis for finding that Mr. Hoffa or the Hoffa Slate actively participated in a *Rules* violation in connection with the cashier's check, and no basis for withholding certification of Mr. Hoffa's election on these facts. Even in the absence of misconduct, however, the strict liability provisions of the *Rules* governing campaign contributions require the Hoffa Slate to disgorge the improper contribution. *Rules*, Art. XII, § 1(b)(9). That remedy will be discussed below.

b.    Findings Concerning Mr. Potter

Mr. Potter's conduct in this matter raises different questions. A thorough investigation was conducted into the facts surrounding the $5,000 cashier's check that Mr. Potter funded from his personal checking account at the Justin State Bank and sent to the Hoffa Slate. The Election Officer examined Mr. Potter under oath about the cashier's check and his claimed source of funds. On November 5, 1998, the Election Officer sent a document request to Mr. Potter asking him to produce his bank statements and cancelled checks for the period from July 1997 through December 1997 and to produce

> [a]ll documents, whether in the custody and control of Mr. Potter, Mr. Potter's campaign for IBT International Office, or Local Union 19, pertaining to cashier's check no. 13453 drawn on the Justin State Bank (copy attached) including, but not limited to, any documents showing the source of funds for the cashier's check.

10472

The document request clearly informed Mr. Potter that he was going to be asked about cashier's check no. 13453 (the one he had sent to the Hoffa Campaign), and even attached a copy of the document. This request gave Mr. Potter an opportunity to prepare for his examination on the subject of the cashier's check.

At the start of the examination, Mr. Potter produced copies of financial records from his bank and similar accounts. Specifically, he produced on November 11, 1998 records of his accounts at the Justin State Bank and records of certain Smith Barney brokerage accounts. After the IRB issued its proposed charges, counsel for Mr. Potter submitted additional argument to the Election Officer and produced records of a credit union account maintained by Mr. Potter that had not been previously disclosed.

The Election Officer questioned Mr. Potter under oath, and also took sworn testimony from each of the five individuals who were listed as having made the $1,000 donations that purportedly funded the cashier's check. Based upon that investigation, the Election Officer finds that the $5,000 cashier's check was funded with Mr. Potter's personal funds and not by contributions from the five individuals to whom it was attributed. By contributing $5,000 of personal funds using a cashier's check on top of a personal check contribution of $5,000, Mr. Potter exceeded the court-approved campaign contribution limits governing the rerun election.

J.D. Potter became the President and principal officer of Local Union 19 in Grapevine, Texas in June 1997. Mr. Potter testified that in September 1997 he received a telephone call from Laird Evans, another regional IBT official, asking if he wanted to join the Hoffa Slate for the rerun election as a candidate for Southern Region Vice-President. Mr. Potter expressed interest and then spoke to Mike Bane, of Local Union 614 in Michigan, and Hoffa Campaign official David Lyle about joining the Hoffa Slate.[1] Mr. Potter testified that he learned from Mr. Lyle that a $10,000 campaign contribution was required to join the slate. Mr. Potter also testified that he talked about the possibility of joining the Hoffa Slate with people who worked at Local Union 19. Among those with whom he aired this decision with were Business Agents Merrianne "Casey" Sharpe and Joe Christian, his Aunt Pat Potter (the Local Union 19 bookkeeper), and recording secretary Lori Frascone.

4/20/2004

Mr. Potter had been participating in an investment club managed by Tom Burnette, the former President of Local Union 19. In September 1997, the club holdings were liquidated and the cash was paid out to the participants. Mr. Potter testified that one of the several reasons for liquidating the club was that he needed money so that he could make the required contribution to join the Hoffa Slate. Mr. Potter and the other club members received their distribution in the form of personal checks from Mr. Burnette in the amount of $10,065. Mr. Potter deposited his check into his personal account at the Justin State Bank. Other club members who received equivalent distributions were Pat Potter and Joe Christian.

On September 29, 1997, Mr. Potter wrote a personal check for $10,000 on his account at the Justin State Bank payable to "James P. Hoffa" with a note on the memo line that the check was for the "Hoffa Slate." He sent the check to Mr. Hoffa by UPS overnight delivery. After he had written the check, he mentioned to his attorney, James Hicks, that he had made this contribution. In a series of discussions that involved Mr. Hicks, Mr. Potter, and attorneys or other representatives of the Hoffa Slate, Mr. Potter learned that the *Rerun Plan* for the rerun election set a limit of $5,000 on the amount of personal funds that a candidate could contribute to a campaign and a limit of $1,000 on contributions

[2]

from IBT members. See *Rerun Plan*, § IV.     Mr. Hicks contacted the Hoffa campaign to retrieve the $10,000 check and Mr. Potter placed a stop payment order on the check. The Hoffa campaign returned the check.

On October 1, 1997, Mr. Potter wrote a personal check for $5,000 on his personal account at the Justin State Bank payable to "James P. Hoffa." The notation on that check's memo line states that the check is for "Candidate Hoffa Rerun." At this point, Mr. Potter needed to raise $5,000 dollars in compliance with the rules so that he could make the requested $10,000 threshold contribution to the Hoffa campaign.

[3]

to the Hoffa campaign.     According to Mr. Potter, he talked very little around Local Union 19 about his fundraising problem. Nevertheless, according to Mr. Potter's testimony, five people came to him sometime between September 30 and October 2, 1997 and spontaneously decided to contribute $1,000 each to his campaign. The five identified contributors were Casey Sharpe, Joe Christian, Pat Potter, Lori Frascone, and Bettie Litton, a clerical worker at Local Union 19. Mr. Potter testified that the contributions were made entirely in cash. Although these were crucial events in the sequence of

10474

Mr. Potter's entry onto the Hoffa Slate, in his November 1998 deposition Mr. Potter could not recall any details of these gifts such as: where or when they were made; what was said at the time by him or the donor; or whether the cash given was in a small number of large bills or a large number of small bills.

After he had accumulated this $5,000 in cash Mr. Potter stated that, on October 2, 1997, he intended to deposit it in the Justin State Bank and purchase a cashier's check for $5,000. When he was going to drive to the bank on that day, however, he was riding in his pickup truck and the cash was in a secret hiding place in his Lincoln Town Car. He testified that he decided on the spot that, because money is fungible, he could swap the cash he had received for money in his bank account on his personal "books" and fund the cashier's check that way. Mr. Potter never deposited the cash he allegedly received from the five donors to his account. He had the cashier's check drawn on his personal checking account and sent it to the Hoffa campaign. This cashier's check (no. 13453) was payable to the order of "James P. Hoffa." A list of five names in Casey Sharpe's handwriting identified Sharpe, Christian, Potter, Frascone, and Litton as the five $1,000 donors. The Election Officer obtained a copy of this list from, among other sources, the Hoffa Slate's files.

Mr. Potter was asked several times during his deposition about what he had done with the $5,000 cash. He said that he had kept the money to use for emergencies and volunteered, as corroboration, that the very cash he had received was still in its hiding place in the car that he had driven to the deposition:

> A:    . . . I'm going to tell you, I have still got that money. And it is right out here in the parking lot and where it is at is in my car, in the trunk, it is a Lincoln and it is one of those where the discs are at.
>
> Q:    The CD player?
>
>                                                                  [4]
>
> A:    Yeah, it is down in there and it has been there. . . . .

Tr. at 5; see also Tr. at 67 ("I put their money in that place that is in the Lincoln now") (emphasis added). Returning to the same subject later in the deposition, just before going to the car to examine the money, Mr. Potter gave the following testimony:

> Q:    As I understand your [testimony], what we are going to see down there is

4/20/2004

the money that these individuals gave you; is that right?

A:    Yes.

Tr. at 92. Mr. Potter allowed the money to be examined by the Election Office and IRB investigators. The investigators found $4,700, in 93 bills, stored in a plain white business envelope in the CD player storage area of the car trunk. The face of the bills were photocopied and submitted by the IRB Chief Investigator's Office to the Department of the Treasury for analysis.

The unambiguous testimony of Mr. Potter was that the money stored in his Lincoln Town Car on the date of the deposition was "the money" given to him by the five individuals as a campaign contribution in late September or early October 1997. This testimony was false. As reported to the IRB and summarized in the proposed charges, "thirteen 1995 Series twenty-dollar bills produced by Potter were not in circulation on October 2, 1997, the date by which Potter testified that he had received all five cash contributions." The existence of the cash without any way to establish a chain of custody back to October 2, 1997 would not have corroborated Mr. Potter's testimony. The proof that some of the bills could not have been received at the time he claimed, however, undermines the elaborate story Mr. Potter told about how he came to receive unsolicited $1,000 contributions in a two-day period that fortunately coincided with his need to pay his initial contribution to the Hoffa Slate. It is far more likely, as Mr. Potter suggested in another part of his testimony, that he took the "easier" route and simply used his available personal funds to have the bank draw the cashier's check on October 2, 1997. That scenario is also consistent with Mr. Potter's bank records.

Mr. Potter opened an account for his campaign funds at a bank in Grapevine, Texas. The $5,000 cash was never deposited to that account, reported on Mr. Potter's CCER or treated in any way as a contribution to his campaign. The money was represented as, and reported as, a contribution to the Hoffa campaign consolidated in a cashier's check.

The Election Officer took sworn testimony from the five identified contributors and each one testified under oath that they made the $1,000 donation as reported. As a whole, the testimony of these witnesses, and that of Mr. Potter concerning the five $1,000 contributions is not credible. Three of the alleged donors, by their own testimony, lacked ready cash to make the contributions. Casey Sharpe testified that she borrowed $1,000 from a friend, not an IBT member, who resided in Florida but

Officer challenging the conclusion that he had testified falsely about the bills stored in his car. The essence of this argument is that the deposition questions were ambiguous. For example, Mr. Potter supposedly did not understand that the question asking whether the cash in the trunk was "the money that these individuals gave you" referred to the actual bills he had received from the five purported contributors, or merely asked whether he was carrying a sum in the car representing a fund that had started with those cash contributions. Mr. Potter also offered to provide additional witnesses who would testify about cash purchases he had made, and provided a statement from a credit union to show that he had another account that could be a source of cash to replenish the fund in his car trunk.

The additional material does not change the conclusion reached here. Under Mr. Potter's theory, the fund was used for union-related transactions, such as buying repair materials for the union hall or posting bonds for employees or workers in need of such assistance. Despite months of time to put together a presentation, Mr. Potter has submitted nothing to show that this money was in fact treated as union funds; that when he bought pipe for the union hall, or posted bail, he documented the expense and had it reimbursed. It is not likely that Mr. Potter set the fund up as his personal donation to support the operation of Local Union 19. That scenario is even less credible if it is argued that he continued to replenish the fund from his personal assets without any reimbursement from Local Union 19. As for the credit union records, aside from the fact that they should have been produced at the deposition, they undermine Mr. Potter's account more than they bolster it. At best, the statement shows he had another account from which he could put together a cash fund if necessary to back up a story.

Moreover, several witnesses gave testimony that undermined Mr. Potter's testimony about the cash fund. Mr. Christian worked as a business agent for Local Union 19 from 1992 to 1998, including the period when Mr. Potter became President. During that entire time, he had never heard that Mr. Potter kept a store of cash on hand in his car or on his person for union emergencies. Similarly, Ms. Sharpe a Local Union 19 Business Agent since August 4, 1997, testified that she was not aware of any emergency cash fund that Mr. Potter kept to assist local union members in trouble. As Business Agents, Mr. Christian and Ms. Sharpe would have known about this fund if it had really existed.

J.D. Stalicup, Jr., Vice-President of Local Union 19 for approximately 10 years, was examined under oath. He testified that he was not aware of any money kept on hand by Mr. Potter as an

4/20/2004

emergency fund.

James Shepherd, formerly a Trustee of Local Union 19 and currently the Secretary-Treasurer, was examined under oath. He testified that he was not aware of any Local Union policy that made large amounts of cash available to Mr. Potter for emergencies involving local members. He also was not aware of Mr. Potter's having purportedly kept large amounts of cash on his person or in his automobile.

Based on the evidence summarized above, the Election Officer finds that James D. Potter contributed $10,000 from his personal funds to the Hoffa campaign, and falsely described the contribution as coming half from his own funds and half from five individual contributions of $1,000 each. Mr. Potter thus violated the limits on campaign contributions applicable to the rerun election.

       c.     <u>Remedy</u>

The Election Officer finds that Mr. Potter's conduct violated the campaign contribution limits. See *Rerun Plan*, § IV. Considered solely in monetary terms, the Election Officer could not conclude that the excess contribution violation may have affected the outcome of the election. Mr. Potter made the excess $5,000 contribution to the Hoffa campaign, not to his own, regional effort. The impact of the contribution would therefore be assessed in the context of the election for union-wide offices and not the regional election. The $5,000 amounts to approximately one-half of one percent of

[5]

the $995,683 in fundraising reported by the Hoffa campaign through December 31, 1998. The amount was contributed early, in October 1997, and the contribution is not traceable to any particular campaign expenditure or event. In a campaign that raised and spent almost $1 million and where the narrowest margin of victory for a Hoffa Slate union-wide candidate was 40,991 votes, no connection can

[6]

be established between the amount of funds underlying the violation and the outcome of the election. Nevertheless, the nature of this violation, and Mr. Potter's false testimony about the campaign contributions requires the Election Officer to impose the most severe sanction. By his own testimony, Mr. Potter knew that the *Rerun Plan* limited candidates to contributing $5,000 of personal funds to a campaign or slate. By funding the cashier's check to the Hoffa campaign with his own money after having contributed his own $5,000 by personal check, Mr. Potter intentionally violated the contribution limit. Mr. Potter concealed the violation by providing the Hoffa campaign with a document

4/20/2004

that falsely attributed the money to five donors. Knowing in advance of his examination that he was going to be questioned about the cashier's check Mr. Potter constructed a false story that he hoped to corroborate by presenting to the Election Officer and the IRB $4,700 in cash and representing that to be "the money" he had received at the end of September 1997 from the five contributors. The cash, however, demonstrated the falsity of his testimony about the contributions. The facts here show a candidate for IBT International office who violated the *Rules* and who then compounded the violation by a cover-up and by false statements in testimony to the Election Officer and the IRB. This conduct is extremely serious and warrants more than a remedial fine.

In reaching this conclusion, the Election Officer finds that Mr. Potter personally participated in the scheme to violate the rules and that he intentionally gave testimony about the donations that he knew to be false. The Election Officer contrasts this finding of Mr. Potter's personal participation in, and false testimony about the offense with the findings in PR-35-EOH in which Mr. Hoffa and the Hoffa Slate were found to have violated campaign finance restrictions. In that case, a remedial fine was appropriate because the evidence did not support, inter alia, a finding that Mr. Hoffa intentionally lied in connection with the underlying violations, or intentionally lied to the Election Officer in the investigation to conceal the alleged misconduct. The words used to state the findings on Mr. Hoffa's testimony were chosen carefully. See Carey Slate Protest, PR-35-EOH (MGC) at 30 (Hoffa testimony not "complete or accurate"); at 32 (Hoffa did not testify "fully or accurately") at 87 (witnesses, including Hoffa described as "vague, and not credible"). As the courts have noted, the Election Officer is in the best position to assess testimony of witnesses in Election Officer investigations, and to make credibility findings. United States v. IBT (Appeal of Carey), 988 F. Supp 759, 767 (S.D.N.Y. 1997), aff'd, 156 F.3d 354 (2d Cir. 1998) (Consent Decree officers are "best equipped to evaluate the demeanor, credibility, and ultimately the culpability of those who appear before [them].") (quoting United States v. IBT (Appeal of DiGirlamo), 824 F. Supp. 410, 418 (S.D.N.Y. 1993)). These findings about Mr. Hoffa's intent were based on the Election officer's review of documents and the assessment of Mr. Hoffa's credibility when confronted with and questioned about the documentary evidence.

The evidence in PR-35, considered in its totality, could not support a conclusion that

Election Officer's exercise of discretion to disqualify a candidate depends on the "unique facts underlying a substantiated *Rules* violation and the particular context of the violation . . . ." Carey Slate Protest, Post-35-EOH (MGC) at 112. In this case, the Election Officer has found that Mr. Potter participated personally in a *Rules* violation and intentionally lied about the matter in the investigation. His conduct is egregious and cannot be condoned under the Consent Decree's requirements for a democratic election that is fair and honest. See In re Carey Slate, 97 –Elec. App. – 322 (KC) at 7 (November 17, 1997).

Furthermore, a remedial fine is also necessary here. Such a fine will provide guidance for future IBT elections, to provide an example so that future candidates will know their obligation to abide by contribution limits and to ensure their compliance. See, e.g., United States v. IBT (Carey Slate Protest), 9 F. Supp. 2d at 362. For guidance in calculating the amount of the remedial fine, the Election Officer has determined to look to the law and regulations on contribution limits applied by the Federal Election Commission ("FEC"). A rule promulgated under the Federal Election Campaign Act provides [7] for the imposition of civil penalties in the case of individuals that violate contribution limits.    The rule authorizes imposition of a civil penalty that

> Shall not exceed the greater of $5,500 or an amount equal to any contribution or expenditure involved in the violation. In the case of a knowing and willful violation, the civil penalty shall not exceed the greater of $11,000 or an amount equal to 200% of any contribution or expenditure involved in the violation.

11 C.F.R. § 111.24(a). As already noted, the testimony that Mr. Potter gave about the fund in his trunk, knowingly false, supports the conclusion that the contribution violation in this case was committed by him with knowledge and willfulness. Indeed, his knowledge of the $5,000 limit is undisputed and is apparently what led to the cashier's check and the false contribution documentation in this case. Using the FEC rule as a guide, the Election Officer imposes a remedial fine of $11,000 on Mr. Potter for this violation, payable to the Election Office.

Although the Hoffa Slate did not engage in any wrongful conduct in connection with Mr. Potter's improper campaign contribution, the *Rules* impose "strict liability" on candidates "to insure that each contribution is permitted under the *Rules*." *Rules*, Art. XII, § 1(b)(9). Unlike the situation in PR-409, where the Hoffa Slate knew nothing of the violations and received no value that it can now

10482

4/20/2004

disgorge, here the Hoffa Slate received and benefited from the improper $5,000 cash contribution. The strict liability rule requires that the Hoffa Slate disgorge the $5,000. The payment shall be made to the Election Office. See United States v. IBT (Carey Slate Protest), 9 F. Supp. 2d at 362-63.

The determination to disqualify Mr. Potter does not, however, necessitate ordering a second rerun election for the position of Southern Region Vice-President. The Election Officer recognizes the "expensive and disruptive" nature of the election process. Local 299, 515 F. Supp. at 1282. The 1996 International Officer Election has been in process for almost four years (starting with the delegate elections) and, under the IBT Constitution, the delegate elections for the next International convention will begin next year. The time has come to close this election cycle.

The Leedham Slate protest contended that the candidate with the next-highest vote total should be certified as elected in the event of Mr. Potter's disqualification. The Election Officer rejects this argument. [8] It is apparent from the vote tabulation that the IBT membership cast their votes almost entirely on the basis of slates, and not separately for individual candidates on a national or regional basis. [9] The intent of the electorate, reflected in this voting pattern, is to elect a slate of affiliated candidates. The Hoffa Slate won the Southern Region by the smallest margin of the various IBT regions, but the margin reflected the slate victory, not that of any particular candidate. To certify the next-highest candidate as the winner would be contrary to the voters' intent as expressed by the slate voting pattern

The Election Officer has the power to "take whatever remedial action is appropriate" to cure a *Rules* violation. Art. XIV, § 4. In this, case the Election Officer has determined that an effective remedy can be fashioned that addresses the violation, is consistent with the voters' intent, and does not require another rerun election for this one position. The balloting shows clearly that the majority of [10] voting Teamsters decided for this election to entrust the Hoffa Slate with the IBT's elective offices. By certifying the election results with one Southern Region Vice-President's seat as vacant, the Mr. Hoffa and the General Executive Board would then have the authority to fill that slot. See IBT Constitution, Art. VI, § 1(a). This is the same process that would be followed if Mr. Potter were seated were then removed from office. Using this remedy, the voters' intent is served by allowing the slate of

officers they elected to fill the seat with an officer who holds views consistent with the other elected individuals. It is reasonable to implement this remedy now given that the next rank-and-file vote for IBT International officers must occur, under the IBT Constitution, before the end of 2001. The Election Officer has determined that this remedy is specifically appropriate to this very unique situation. The violation warrants disqualification of Mr. Potter; it affects only one of the seats to be filled by the election; there is a method available to fill the vacancy that will be consistent with the voter's intent; and it is appropriate to exercise this extraordinary authority so that the IBT will have at least a brief respite from four years of election activity before the next cycle begins. Accordingly, the Election Officer will certify the election results with this Southern Region Vice-President seat as vacant. The seat may be filled according to the procedures specified in the IBT Constitution, Art. VI, § 1(a).

---

[1]

    Mr. Lyle has no recollection of this conversation. Mr. Hoffa, however, recalls discussing the $10,000 contribution with Mr. Potter in this time frame.

[2]

    When first approved at the end of September 1997, the *Rerun Plan* imposed a $1,000 ceiling on all campaign contributions from members, and a $5,000 ceiling on all campaign contributions from candidates. United States v. IBT (First Rerun Election Rules Order), 981 F. Supp. at 229. The rule was later modified to permit members to contribute $1,000 to each candidate or slate, and candidates to contribute $5,000 to each candidate or slate. United States v. IBT (Revised Election Rules Order), 1998 WL 136431, at *3-4 (S.D.N.Y. 1998). Mr. Potter admitted knowing that he was subject to the $5,000 limitation as of the date he made the improper contribution, and the later relaxation of a different aspect of the rule does not affect his violation.

[3]

    Mr. Potter candidly testified that as a last resort he would simply have used his personal funds to make up the additional $5,000 he needed to contribute to the Hoffa campaign ("ain't saying I would of, but it sure look a lot easier to do").

[4]

    Mr. Potter testified that the cash had been reduced recently by $300 he had used to resolve a problem in Fort Worth. Tr. at 59 ("and all of it is there I think but about $300").

[5]

    That sum appears on the CCER for the Hoffa campaign and does not include funds raised and used separately by Hoffa Slate members.

[6]

    The Election Officer notes, solely for perspective and comparison, that the Cheatem violation involved the diversion of more than $700,000 in IBT funds to generate more than $185,000 in improper campaign contributions. United States v. IBT (Appeal of Carey), 22 F. Supp. 2d at 138. This was used to send approximately 1.7 million pieces of campaign mail to members during the critical balloting period.

4/20/2004

United States v. IBT (Appeal of Morris), 983 F. Supp. at 490.

[7]

It is appropriate to look to FEC standards here because Mr. Potter's conduct is quite similar to that addressed under that regulatory scheme.

[8]

After the disqualification of Mr. Carey in the initial 1996 IBT International election, the Hoffa Slate argued that the candidate with the next-highest number of votes should be certified as the winner. The Election Officer rejected the argument at that time.  Cheatem, Post-27-EOH (BZQ) at 115-19.

[9]

Teamsters Canada is excepted from this analysis.

[10]

This analysis does not apply to Teamsters Canada.

10485

4/20/2004

# DECLARATION OF FRANCIS J. DUGGAN

Pursuant to U.S.C. 1746, Francis J. Duggan hereby deposes and says:

1.    I was Chairman and Member of the National Mediation Board (NMB) from November, 1999 until November 2003. While I was at the NMB, Barbara Casey worked as my confidential assistant. Both my wife and I have known Ms. Casey for many years.

2.    Ms. Casey died on July 2, 2005.

3.    I was aware that Barbara Casey provided a recorded statement to the Office of Special Counsel because she told me she had provided this testimony. On February 11, 2005, Casey advised me via e-mail that she did not have copy of the statement that she had given to the Office of Special Counsel. She wrote me, "They recorded the meeting and said they would call me back when the other people were called."

4.    I was also aware that Barbara became even more concerned about possible retaliation as a result of providing testimony when she learned from newspaper reports about the reorganization at OSC which resulted in the departure of the attorney with whom she had dealt.

5.    While Barbara Casey was sick, she was hospitalized at Sibley Memorial Hospital in Washington, DC for about 30 days. During the week of May 23, 2005, I visited Ms. Casey at Sibley and brought an affidavit prepared by Ms. Mansfield's attorneys for Ms. Casey to review and sign. The affidavit allegedly set forth the information that Ms. Casey had provided to Leslie Kiernan, an attorney for Ms. Mansfield in conversations that they had in April, 2004 and thereafter. I asked Ms. Casey to read the statement over and to sign the affidavit.

6.    Ms. Casey read the affidavit and stated to me that everything in it was true, but she could not sign the statement because she feared that if she signed an affidavit voluntarily, she would "jeopardize her job" at the NMB. (Ms. Casey worked as a confidential assistant to Board Member Read Van de Water after I left the Board.) She was quite upset. Ms. Casey stated to me that she was willing to provide a statement if she was subpoenaed. She further stated that she made a statement to the EEO investigator because she was required to do so, and would do so again if she was served with a subpoena. I discussed signing the affidavit with Ms. Casey on more than one occasion and each time she essentially stated what is set forth in this paragraph. The only real distinction was that previously she had indicated a particular fear of jeopardizing her job and thus her federal retirement benefits.

7.    On several occasions, Ms. Casey advised me of her desire to provide testimony for Ms. Mansfield because she felt Ms. Mansfield had been wrongly treated by Mr. Fitzmaurice.

Exhibit # 2

8.    In addition to providing this sworn statement, I have previously provided on separate occasions sworn statements to the Office of Special Counsel and the EEO investigator.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July _____22_____, 2005

_Francis J. Duggan_
Francis J. Duggan


Sworn before me on this 22nd day of July, 2005.

Notary Public    ELSA SOLOMON
Exp 10-31-2008

## DECLARATION OF BARBARA C. CASEY

Pursuant to 28 U.S.C. § 1746, Barbara C. Casey hereby deposes and says:

1.      I currently serve as the Confidential Assistant to Read Van de Water, a member of the National Mediation Board "NMB"). I have been in this position since December 2003. Prior to working for Ms. Van de Water, from December 29, 1999, I served for four years as the Confidential Assistant to Francis J. ("Frank") Duggan, a former member and chair of the NMB. In each of these positions, my responsibilities have been to assist the Board member with his or her needs and to support the mission of the agency.

2.      I first met Mr. Fitzmaurice in the spring of 2002 prior to his appointment and confirmationto the NMB. I was asked by Frank Duggan if I would take Mr. Fitzmaurice around Washington to look at real estate. I did so, driving him around the Washington, D.C. area and assisting him in finding a residence. During this time period, he asked me a number of questions about Ms. Mansfield, who then served as Chief of Staff at the NMB. He left me with the clear impression that he did not like Ms. Mansfield and he did not want her to remain at the NMB. At some point during this time period, Mr. Fitzmaurice told me that Ms. Mansfield had "deep-sixed a friend of his named Potter." He stated that he intended to "do to her, what she had done to his friend, Potter" or words to that effect. This and other statements and disparaging remarks Mr. Fitzgerald made about Ms. Mansfield left me with the distinct impression that one of the reasons he did not like Ms. Mansfield had to do with the way she treated Mr. Potter. Mr. Fitzmaurice told me words to the effect that once he was on the NMB she had to be gone.

3.      Once Mr. Fitzmaurice moved to Washington, he lived across the street from me. He periodically gave me a ride to and from work. We would talk in the car and at times he would make comments about Ms. Mansfield. Some of the comments he made to me about Ms.

Mansfield occurred in the car, and others in the office. At some point, I decided that these remarks, among other things, made me so uncomfortable that I generally preferred getting home by some other way.

4.    I remember at one point him saying that if Ms. Mansfield "thought she would get to me by talking Yiddish because my wife was Jewish, she had another thing coming." On another occasion he told me that he thought ALPA, ["Air Line Pilots Association"] was running the agency and that was going to change" once he became Chairman of the NMB. He told me he thought the Democrats should be swept out of the agency because he wanted to follow the President's agenda. He called Ms. Mansfield a "bitch" several times during this and the prior period and indicated that he wanted to get rid of her. Although he sometimes made derogatory remarks about others, none of them were said with the same force or as many times as he said derogatory things about Ms. Mansfield. I informed Mr. Duggan about the nature of Mr. Fitzmaurice's remarks about Ms. Mansfield around the time that he made them.

5.    Shortly after Frank Duggan completed his last evaluation of Ms. Mansfield, which I typed up and saw, and which was glowing, Mr. Fitzmaurice told me that "Benetta does not know her ass from a hole in the ground."

6.    In the fall of 2004, in connection with an investigation by the Office of Special Counsel regarding Mr. Fitzmaurice's treatment of Ms. Mansfield, I was interviewed by employees of that Office, specifically by a person who identified himself as Quentin Barrett, an OSC investigator, and by Alberto Rivera-Fournier, an OSC attorney. The interview was sworn and recorded. I was not given a copy of the recording. Because I serve at the pleasure of Ms. Van De Water or the Board and would only become qualified in years of service for retiree health or pension

2

benefits due in December 2004 and May 2005, I wanted the fact that I was interviewed kept confidential from agency employees.

6.      In early 2005, I was asked to give an Affidavit to the NMB in connection with the investigation of a discrimination complaint filed by Ms. Mansfield in the matter NMB-EEO-04-1. That affidavit is attached as Exhibit A to this Declaration and hereafter is referred to as "NMB Affidavit." I believe the NMB Affidavit was prepared by Larry Brantley, who identified himself to me as the EEO Contract Investigator charged with investigating Ms. Mansfield's discrimination complaint. It reflects my responses to questions posed to me by Mr. Brantley during an interview he conducted.. I fully adopt the contents of that Affidavit and incorporate its contents here.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed on June ___, 2005.

_____

Barbara C. Casey

3

## DECLARATION OF LESLIE B. KIERNAN

Pursuant to 28 U.S.C. § 1746, Leslie B. Kiernan hereby deposes and says:

1.     I am a partner in the law firm of Zuckerman Spaeder LLP, 1800 M Street, N.W., Washington, D.C. 20036 and a member of the D.C. bar. Zuckerman Spaeder LLP was retained in approximately February 2004 to represent Benetta Mansfield in connection with potential claims against the National Mediation Board and its then Chairman Edward Fitzmaurice for unlawful employment practices.

2.     In connection with our representation of Ms. Mansfield, I had several telephone conversations with Barbara C. Casey, who was then serving as the confidential assistant to NMB Board Member Read Van de Water.

3.     My first telephone conversation with Ms. Casey occurred in April 2004. I introduced myself to Ms. Casey as an attorney representing Ms. Mansfield and asked her if she would be willing to speak with me regarding Mr. Fitzmaurice and his behavior towards Ms. Mansfield.

4.     Ms. Casey agreed to speak with me but indicated from the outset that she was concerned about losing her job if Mr. Fitzmaurice or Ms. Van de Water perceived that Ms. Casey was volunteering to help Ms. Mansfield. Ms. Casey told me that she had to complete another year of service at the NMB in order qualify for benefits if she retired or was terminated. Ms. Casey told me that she was a widow and that keeping her benefits were very important to her. She said that she was a Schedule C employee and did not want to do anything that could cause her to be fired.

5.     She told me that she had called Roland Watkins, the NMB's EEO officer, to find out what protections she had as a government employee if she cooperated with Ms. Mansfield. She said that Mr. Watkins told her she had the same protections as a civil service employee. Ms.

Exhibit # 3

Casey said she had the impression even after she spoke with Mr. Watkins that she could be fired for cooperating with Ms. Mansfield because she was a Schedule C employee.

6.      Ms. Casey told me that she first met Mr. Fitzmaurice prior to his appointment to the NMB. She said that she was asked to take Mr. Fitzmaurice around Washington to look at real estate. Ms. Casey said that once Mr. Fitzmaurice moved to Washington, he lived across the street from her. She said that he periodically gave her rides to and from work. Ms. Casey said that she and Mr. Fitzmaurice would talk in the car, and that he sometimes made comments about Ms. Mansfield on these car rides. At other times, his remarks about Ms. Mansfield occurred at the office. Ms. Casey told me that at some point she decided that Mr. Fitzmaurice's remarks about Ms. Mansfield and others made her so uncomfortable that she generally preferred getting home by some other means.

7.      Ms. Casey said that Mr. Fitzmaurice asked her questions about Ms. Mansfield early on. Ms. Casey said that Mr. Fitzmaurice left her with the clear impression that he did not like Ms. Mansfield and he did not want her to remain at the NMB. Ms Casey told me that it was her belief that, "once he was on the Board, he decided that she [Ms. Mansfield] had to be gone." Ms. Casey told me that Mr. Fitzmaurice had told her that Ms. Mansfield "had deep-sixed a friend of his – Potter" or words to that effect. According to Ms. Casey, Mr. Fitzmaurice left her with the impression that one of the reasons he did not like Ms. Mansfield had to do with the way Ms. Mansfield had treated Potter. Ms. Casey said that she encouraged Mr. Fitzmaurice to wait until he was working at the agency and had learned the job before he made any decisions.

8.      Ms. Casey said that Mr. Fitzmaurice told her that he believed Ms. Mansfield had been "hand-picked by [Stephen] Crable," her predecessor as Chief of Staff who had left the agency to work at ALPA, the Air Line Pilots Association. Ms. Casey told me that Mr. Fitzmaurice had

said that he thought "ALPA was running the agency and that was going to change" once he became Chairman of the NMB. Ms. Casey told me that Mr. Fitzmaurice had expressed the view that Democrats should be swept out of the agency because they won't follow the President's agenda.

9.     Ms. Casey told me that Mr. Fitzmaurice had made anti-Semitic remarks about Ms. Mansfield. She said Mr. Fitzmaurice had said words to the effect "if she [Mansfield] thought she would get to him [Fitzmaurice] by talking Yiddish because his wife was Jewish, she had another thing coming."

10.    Ms. Casey told me that Mr. Fitzmaurice had told her that "Benetta does not know her ass from a hole in the ground." Ms. Casey said that Mr. Fitzmaurice made this comment when Frank Duggan, the previous chairman of the NMB was completing Ms. Mansfield's performance evaluation. According to Ms. Casey, Mr. Fitzmaurice was angry with Mr. Duggan   for   giving Ms. Mansfield a glowing recommendation.

11.    Ms. Casey told me that Mr. Fitzmaurice was "evil and vile." She said that he behaved inappropriately around her, often using profanity. For example, Ms. Casey said that Mr. Fitzmaurice told her that Ms. Mansfield would be "fucking" gone and that he thought Mr. Crable was "fucking" Ms. Blackwell.

12.    Ms. Casey told me that he had "raked Benetta over the coals" and that "it was an atrocity what he has done to her." Ms. Casey told me that in her view Mr. Fitzmaurice had "no respect for any woman." Ms. Casey told me that Mr. Fitzmaurice had "wreaked havoc at the office" and that "everyone was in fear for their jobs." Ms. Casey told met that "everybody was walking on egg shells" and that this had been the case since Mr. Fitzmaurice took over as chairman.

13.    I talked to Ms. Casey again in September 2004 to ask if she would be willing to provide a statement to the Office of Special Counsel in connection with a complaint that Ms. Mansfield had filed. Ms. Casey said that she was concerned that if she volunteered to assist Ms. Mansfield that she could be fired by the agency. She was concerned that Ms. Van de Water would view such cooperation as acting against the agency. Ms. Casey said that she would provide information if she were required to do so by the OSC. In this telephone conversation Ms. Casey told me that she would have completed 15 years of government service on December 29, 2004, which would entitle her to retire with a pension. She said that she would be able to retire in May 2005 once she turned 62 years of age. She said that did not feel comfortable doing anything to assist Ms. Mansfield in connection with the case until after she retired.

14.    I talked to Ms. Casey on a few subsequent occasions in the period March through May 2005. I called her in mid March 2005 to let her know that Ms. Mansfield's EEO matter was progressing and that it was possible that she would be called as a witness if Ms. Mansfield filed a case in court. At that time, Ms. Casey advised me that she had just been diagnosed with lung cancer.

14.    I called Ms. Casey in mid to late April to follow up on our March conversation. She said that she was going for chemotherapy and that she would be willing to speak with me further once she felt better. She said that she wanted to help Ms. Mansfield and felt very badly about what Ms. Mansfield had been through.

15.    I last spoke to Ms. Casey once again in mid to late May 2005. She told me that I had reached her in the hospital (I typically reached her through her cell phone number) and that she had had complications from chemotherapy. I tried to call her again in early June but did not reach her.

I hereby declare under penalty of perjury that the foregoing is true and correct.  Executed on July 21, 2005.

Leslie B. Kiernan

## DECLARATION OF MICHAEL A. LUCKEY

Pursuant to 28 U.S.C. §1746, Michael A. Luckey hereby deposes and says:

1. I am the son of Barbara C. Casey, formerly of Washington, D.C.    I reside at 6214 Hozlow Drive, Wint Hill, North Carolina 28227.

2. My mother, Barbara C. Casey, died of lung cancer and pneumonia on July 2, 2005. At the time, she was employed as a Confidential Assistant to Member Read Van de Water at the National Mediation Board.

3. My mother died intestate. Her only heirs are myself and my brother Paul Raymond Luckey. On or around July I was appointed as the "personal representative" under D.C. law to administer her estate.

4. I am providing this affidavit because I believe that it carries out the wishes of my mother with regard to the disposition, upon her death, of her recorded testimony before the Office of Special Counsel involving the actions and statements of Board member Edward J. Fitzmaurice, Jr. Specifically, I know that she would want her testimony to be available for use in any proceeding involving Benetta Mansfield and Mr. Fitzmaurice, Jr. and/or the National Mediation Board.

5. I understand that my mother, Barbara C. Casey, during her lifetime, was concerned that any testimony that she would give against Mr. Fitzmaurice or the National Mediation Board, could

Exhibit # 4

subject her to retaliation. My mother loved working and her position at the National Mediation Board was very important to her personally and professionally. During the last year of her life, I know that she feared making public her testimony regarding Mr. Fitzmaurice's acts and statements regarding Ms. Mansfield. She was a political employee and she feared retaliation and loss of her job if it became known that she had given testimony in the above-stated matter.

6. Now that my mother no longer needs to fear retaliation, I wish the record of any statement she provided the Office of Special Counsel be preserved and provided to Ms. Benetta Mansfield and her counsel so that it can be used in any case Ms. Mansfield files. I have read a copy of Ms. Slavet's three page July 7, 2005 letter to Special Counsel Bloch and urge him to release my mother's taped interview as requested by that letter.

I hereby declare under penalty of perjury that the foregoing statement of ___ pages is true and correct. Executed on July 12, 2005.

_MAL 7/12/05_

Michael A. Luckey

**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505

July 8, 2005

RECEIVED

JUL 1 2 2005

Original File Copy
Beins, Axelrod, Kraft,
Gleason & Gibson, P.C.

Ms. Benetta Mansfield
c/o Ms. Beth S. Slavet, Esq.
Beins, Axelrod, Kraft, Gleason & Gibson, P.C.
1717 Massachusetts Ave., NW, Suite 704
Washington, DC 20036-2001

      Re: OSC File No. MA-04-1921

Dear Ms. Mansfield:

    In accordance with 5 U.S.C. § 1214(a)(1)(C)(ii), the Office of Special Counsel
(OSC) is required to advise you of the status of your complaint within 60 days after our
last notice to you of the status of your complaint on May 12, 2005.

    This letter is a 60-day status update to advise you that your matter remains open
in the Investigation & Prosecution Division. The OSC's investigative activity into your
case is on-going. If you have any questions concerning this matter, please contact the
undersigned at 202-254-3677, or e-mail me at qbarrett@osc.gov.

                          Sincerely,

                          Quentin Barrett
                          OSC Investigator

                                                    Exhibit # 5

**U.S. OFFICE OF SPECIAL COUNSEL**
1730 M Street, N.W., Suite 218
Washington, D.C. 20036-4505

RECEIVED

JUL 2 0 2005

Original File Copy
Beins, Axelrod, Kraft,
Gleason & Gibson, P.C.

July 19, 2005

Ms. Benetta Mansfield
c/o Ms. Beth S. Slavet, Esquire
Beins, Axelrod, Kraft, Gleason & Gibson, P.C.
1717 Massachusetts Avenue, N.W.
Suite 704
Washington, D.C. 20036-2001

    Re:  OSC File No. MA-05-0349

Dear Ms. Mansfield:

    This is as a 60 day status update, *i.e.*, 60 days since the last status notice was sent to you concerning the report of prohibited personnel practices filed with this office. In accordance with 5 U.S.C. § 1214(a)(1)(C)(i), the U.S. Office of Special Counsel (OSC) is required to advise you of the status of your complaint within 90 days after our initial notice to you that we had received your complaint.  We are also required to update that notice every 60 days thereafter.  5 U.S.C. § 1214(a)(1)(C)(ii).

    The OSC investigator assigned to your case, Quentin Barrett, recently transferred from the agency.  Your matter is in the process of being assigned to another investigator. If you have any questions concerning this matter, please telephone me at (202) 254-3600.

    Thank you for your patience.

               Sincerely,

               Ronald K. Jaicks
               Supervisory Attorney

Exhibit # 6

# Beins, Axelrod, Kraft, Gleason & Gibson, P.C.

John Beins
Jonathan G. Axelrod
Barbara Kraft*
Edward M. Gleason*
Richard W. Gibson**
H. David Kelly, Jr.††
Regina Markey
Anh-Viet Ly**

Beth Slavet
Of Counsel

* also admitted in MD
** also admitted in VA
* also admitted in PA
† also admitted in FL
†† also admitted in MA, MI

1717 Massachusetts Avenue, N.W., Suite 704
Washington, D.C. 20036-2001 · WWW.BAKGG.COM
ph: 202.328.7222 · fax: 202.328.7030

July 7, 2005

HAND DELIVERED

Honorable Scott Bloch
Special Counsel
U.S. Office of Special Counsel
Suite 218
1730 M Street, N.W.
Washington, D.C. 20036-4505

Re: OSC File MA-04-1921
Mansfield and National Mediation Board

Dear Mr. Bloch:

The purpose of this letter is to inform you of a recent significant development in this case. On Saturday, July 2, 2005, a key witness in this case, Ms. Barbara Casey, died in her battle with cancer. I am directing this letter directly to you because since the departure of Alberto Rivera-Fournier in March 2005, no new attorney has been assigned to this case. Moreover, on June 27, 2005, Mr. Quentin Barrett, the case investigator, informed me that he was also leaving OSC effective July 8, 2005.

Ms. Casey was identified in Ms. Mansfield's first Board filing as the witness to whom Mr. Fitzmaurice made specific allegations regarding his intent to retaliate against Ms. Mansfield for her role as the Teamsters' election officer in having disciplinary action taken against J.D. Potter, his client and friend, for the former's illegal activities as a candidate for Teamsters' office. Ms. Casey testified with regard to this and other relevant matters in November 2004 in a sworn statement before Attorney Rivera-Fournier and Investigator Quentin Barrett. Your records should demonstrate that Ms. Casey feared retaliation from the NMB for providing testimony and wanted the fact of her providing testimony kept from the NMB – at least until after two crucial retirement eligibility dates – December 2004 and May 2005. They should also show that both the OSC and Ms. Mansfield were concerned about the possibility of such retaliation and accordingly acted in a manner to protect Ms. Casey – to not make known her supportive testimony until absolutely necessary.

With the death of Ms. Casey, OSC and Ms. Mansfield's case has suffered a severe blow. Neither of us will now be able to depose her with regard to her testimony as to Mr. Fitzmaurice's expressions of animus towards and treatment of Ms. Mansfield.

In the meantime, while I had previously been told by your Deputy and career staff that the OSC considered Ms. Mansfield's case a priority, OSC's investigation appears to have

Exhibit # 7

The Honorable Scott Bloch
July 7, 2005
Page Two

languished.  As you may recall, in November, OSC requested a voluntary stay of Ms.
Mansfield's proposed December RIF action, moved forward in December and January to make a
formal request for that stay when the agency refused, and then, rather abruptly made a decision
not to seek that stay at around the same time that it decided to transfer staff from OSC
headquarters.  Since the departure of Mr. Rivera-Fournier and the decision of Mr. Barrett to
leave OSC, this case no longer appears to be an OSC priority.

The lack of any movement on this case by OSC has not gone unnoticed by others.  Indeed, Mr.
Fitzmaurice and the agency appear to be emboldened by the lack of movement of the OSC case
– after leaving Ms. Mansfield on detail at FMCS for many months, it has, just recently, ordered
her back to the agency, despite the fact that the FMCS had requested that she stay at that agency
and she is willing to do so.   (See Attachments)   With the passage of the 120-day period for
exhausting OSC procedures on the agency's RIF of Ms. Mansfield, the lack of OSC progress, the
end of any concern that Ms. Casey can be retaliated against, her case is ripe for review by the
Merit Systems Protection Board, and it seems time to move the case forward to the Board.
However, before doing so, we wished to inquire into OSC's policy with regard to releasing Ms.
Casey's statement and the status of the ongoing investigation to us.

        Given the loss of live testimony by Ms. Casey, in order to effectively prosecute Ms.
Mansfield's case before the MSPB and in other forums, we will need the "best evidence" of her
testimony regarding Mr. Fitzmaurice's animus, her OSC taped interview.  Please take every step
necessary to immediately secure the taped testimony of Ms. Casey.  In addition, please provide
me as soon as possible with an authenticated copy of such tape. If a transcript has been made, as
provided for by OSC's Investigative Manual, please provide that transcript also.

        In making such request, we understand that Ms. Casey was not provided a copy of that
tape at the time, but that the Investigative Manual does require that such tapes be provided to the
witness either at the end of the interview or the completion of all witness interviews.  We also
understand that under normal circumstances, OSC policy would be not to provide us such
testimony through the MSPB discovery process.  However, we do not believe that the policy
reasons for not providing us such testimony is served any longer.  Ms. Casey no longer has any
remaining "privacy" interest or concern about retaliation.  Other than Francis Duggan and Larry
Slagle, both of whom OSC has already interviewed,  we have not identified to you the name of
any other witness with specific knowledge of the Potter Teamster  rationale for Fitzmaurice's
animus.  Moreover, knowing Ms. Casey's expressed concern that she wanted to be of assistance
in providing truthful information in this case, the "best evidence" rule, the importance of such
testimony, the impossibility of our obtaining such testimony while the OSC case was pending,
this is exactly the kind of situation where OSC should provide such testimony.

        In light of our intention to move forward with Ms. Mansfield's case, please advise me as
soon as possible as to whether or not you intend to make Ms. Casey's taped interview available
to us.  In any case, please provide me with an answer and the authenticated tape no later than

The Honorable Scott Bloch
July 7, 2005
Page Three


July 19.  Absent any reply, I will be forced to pursue other appropriate avenues for securing the taped interview.

      Thank you for your attention.

                    Sincerely,

                    Beth S. Slavet

Attachments

cc: Benetta Mansfield

# Beins, Axelrod, Kraft, Gleason & Gibson, P.C.

Louis P. Beins
Jonathan G. Axelrod
Barbara Kraft*
Edward M. Gleason#
Richard W. Gibson**
H. David Kelly, Jr.††
Regina Markey
Anh-Viet Ly**

Beth Slavet
Of Counsel

* also admitted in MD
** also admitted in VA
# also admitted in PA
† also admitted in FL
†† also admitted in MA, MI

1717 Massachusetts Avenue, N.W., Suite 704
Washington, D.C. 20036-2001 · WWW.BAKGG.COM
ph: 202.328.7222 · fax: 202.328.7030

July 13, 2005

HAND DELIVERED

Honorable Scott Bloch
Special Counsel
U.S. Office of Special Counsel
Suite 218
1730 M Street, N.W.
Washington, D.C. 20036-4505

Re: OSC File MA-04-1921
Mansfield and National Mediation Board

Dear Mr. Bloch:

This is in further reference to my letter to you dated July 7, 2005.

Enclosed is a copy of a sworn declaration from Michael A. Luckey, Ms. Casey's son and personal representative for her estate, with regard to the handling of Ms. Casey's sworn testimony in the above-cited matter to the Office of Special Counsel. I have retained the original is in my files.

I have had no response to my earlier letter. Please advise.

Sincerely,

Beth S. Slavet

cc: Benetta Mansfield with attachment
Leslie Kiernan attachment
Michael A. Luckey with attachment

Exhibit # 8

## DECLARATION OF MICHAEL A. LUCKEY

Pursuant to 28 U.S.C. §1746, Michael A. Luckey hereby deposes and says:

1. I am the son of Barbara C. Casey, formerly of Washington, D.C.     I reside at 6214 Hozlow Drive, Wint Hill, North Carolina 28227.

2. My mother, Barbara C. Casey, died of lung cancer and pneumonia on July 2, 2005. At the time, she was employed as a Confidential Assistant to Member Read Van de Water at the National Mediation Board.

3. My mother died intestate. Her only heirs are myself and my brother Paul Raymond Luckey. On or around July I was appointed as the "personal representative" under D.C. law to administer her estate.

4. I am providing this affidavit because I believe that it carries out the wishes of my mother with regard to the disposition, upon her death, of her recorded testimony before the Office of Special Counsel involving the actions and statements of Board member Edward J. Fitzmaurice, Jr.. Specifically, I know that she would want her testimony to be available for use in any proceeding involving Benetta Mansfield and Mr. Fitzmaurice, Jr. and/or the National Mediation Board.

5. I understand that my mother, Barbara C. Casey, during her lifetime, was concerned that any testimony that she would give against Mr. Fitzmaurice or the National Mediation Board, could

subject her to retaliation. My mother loved working and her position at the National Mediation Board was very important to her personally and professionally. During the last year of her life, I know that she feared making public her testimony regarding Mr. Fitzmaurice's acts and statements regarding Ms. Mansfield. She was a political employee and she feared retaliation and loss of her job if it became known that she had given testimony in the above-stated matter.

6. Now that my mother no longer needs to fear retaliation, I wish the record of any statement she provided the Office of Special Counsel be preserved and provided to Ms. Benetta Mansfield and her counsel so that it can be used in any case Ms. Mansfield files. I have read a copy of Ms. Slavet's three page July 7, 2005 letter to Special Counsel Bloch and urge him to release my mother's taped interview as requested by that letter.

I hereby declare under penalty of perjury that the foregoing statement of ___ pages is true and correct. Executed on July 12, 2005.

MAL 7/12/05

Michael A. Luckey

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| BENETTA M. MANSFIELD,<br>4025 N. Randolph Street<br>Arlington, VA 22207<br><br>      Petitioner,<br><br>        v.<br><br>SCOTT BLOCH, Special Counsel,<br>  Office of the Special Counsel<br>1800 M Street, N.W.<br>Washington, D.C.  20036-4505<br><br>     Respondent | ) <br>) <br>) <br>) <br>) <br>) <br>) <br>) Writ of Mandamus/Rule 27 Motion<br>) <br>)    C.A.  No.<br>) <br>) <br>) <br>) <br>) <br>) <br>) |

## MEMORANDUM IN SUPPORT OF PETITION FOR WRIT OF MANDAMUS AND TO PERPETUATE AND MAKE AVAILABLE  TESTIMONY

A.  A WRIT OF MANDAMUS TO ENSURE THE PERPETUATION AND PRODUCTION OF A DECEDENT'S  TESTIMONY BEFORE THE SPECIAL COUNSEL FOR THE USE OF OTHER JUDICIAL BODIES IS AN APPROPRIATELY NARROW REMEDY WHERE THE OSC HAS FAILED TO MEET HIS STATUTORY OBLIGATIONS.

It is well established that mandamus is an extraordinary remedy available only

when no adequate alternative remedy exists.  Barnhart v. Devine, 771 F. 2d 1515, 1524 (D.C. Cir.

1985).  Two courts of appeal, including the U.S. Court of Appeals for the D.C. Circuit, have held

that mandamus lies in order to compel the OSC to perform its statutory duties to adequately

investigate allegations of prohibited personnel practices and adequately discharge its duties.

Weber v. Office of Special Counsel, 209 F. 3d 756 (D.C. Cir. 2000); DeLeonardis v. Weiseman,

986 F. 2d 725, 727 (5th Cir. 1993); see also Barnhart supra at 1524-26.

The instant case seeks the narrow remedy provided by the writ of mandamus – direction to the Special Counsel to exercise his ministerial obligation to preserve and produce the authenticated sworn testimony of a deceased witness, Barbara Casey.

In the normal course of events, had the OSC acted timely and adequately, pursuant to its statutory mandate, and Casey had not died but was available to personally testify without fear of reprisal before the relevant tribunals, Petitioner would have had no need for the writ sought. The initial OSC investigation into Petitioner's allegations produced the sufficient grounds necessary for the OSC 's determination that Petitioner's "'charge warrant[s] a thorough inquiry.'" Wren v. MSPB, 681 F. 2d 867, 874 (D.C. Cir. 1982) citing to II House Committee on Post office and Civil Service, 95th Cong., 1st Sess., Legislative History of the Civil Service Reform Act of 1978 at 1496. Indeed, the OSC made that initial determination on Petitioner's allegations in September 2004. Nonetheless, it has failed to make and complete the additional "thorough inquiry" and failed to take the statutory mandated actions required under 5 U.S.C. §1214 (b)(2)(A).

First, the OSC failed to make a determination at the expiration of the 240 day time period required by 5 U.S.C. §1214 (b)(2)(A), i.e., whether there existed or not reasonable grounds to believe that the personnel actions[1] alleged by Petitioner in her May 2004 OSC complaint were taken as a result of one or more prohibited personnel practices and that corrective action should be taken. More specifically, in the instant case, the OSC failed to make the determination of whether there were reasonable grounds to believe, that in violation of 5 U.S.C. § 2302 , (b)(8) or (b)(9)(A) or (b)(10), Fitzmaurice had discriminated against Petitioner, a court officer, because of her investigation and referral of Fitzmaurice's associate, J.D. Potter, for election misconduct in the

---

[1]  The statutory definition of a personnel action is found at 5 U.S.C § 2302(a).

2

court-supervised 1998 IBT rerun election. Having failed to make that determination, it also then

failed to follow its statutory mandate to report that determination, together with any findings and

recommendations to the NMB and the Office of Personnel Management. See 5 U.S.C.

§1214(b)(2)(B).

Alternatively, the OSC could have found that it lacked reasonable grounds for such belief.

5 U.S.C. § 1214(b)(2)(A)(i). The Special Counsel could then have timely rejected the

Petitioner's allegations and terminated its investigation in January or February, 2005.

Thirdly, the Special Counsel could have requested Petitioner to agree to an additional

specific extension of time for OSC to make such determination. See 5 U.S.C. 2302(b)(2)(A)(ii).

But it failed to exercise or discuss that option at all.

The OSC did none of the above. The OSC did not terminate its investigation into the

allegations of Fitzmaurice's animus towards the Petitioner in January 2005, when the 240 day

period would have expired. Instead, it represented at that time to the Petitioner that it was actively

investigating Petitioner's case and seeking a stay before the MSPB on the NMB's December 27,

2004 RIF action.

Then, in February 2005, when the OSC suddenly and without explanation decided to not

seek a stay, it still failed to inform Petitioner of, or make a determination that, it lacked reasonable

belief as to the Fitzmaurice-Potter allegation. Nor did the OSC seek an additional period of time

to make such a determination. See 5 U.S.C. § 1212(b)(2)(A)(ii). Instead, the OSC told

Petitioner's Counsel that her allegations remained a priority.

Accordingly, the OSC has clearly failed to carry out its specifically prescribed statutory

duties.

3

What has triggered the instant Petition for a writ of mandamus is not merely the failure of the OSC to make any of these determinations with regard to the Petitioner's allegations and to engage in any kind of meaningful investigation or prosecution of Petitioner's allegations since February 2005. Specifically, it is the death of Barbara Casey on July 2, 2005, and, since that time, the failure of the OSC to provide any assurances to Petitioner that it will make Casey's sworn testimony available to her, that triggers this Petition at this time. Petitioner requests this Court to require the securing and production of that testimony pursuant to its equitable powers and in order to prevent the further delay or failure of justice. See Rule 27(e).

At the current time, it appears clear that the OSC is neither prosecuting nor investigating Petitioner's allegations. Effective July 8, even the sole investigator assigned to her case has left the OSC. No new personnel have been assigned.

A brief history reflects the need for this relief.

Between September 2004 and January 2005, when career employees were assigned to her case, Petitioner's allegations of prohibited personnel practices were actively under investigation and prosecution. Then, at around the time that the Special Counsel should have been making the required statutory determinations regarding the Petitioner's allegations, his Office was engaging in an internal, and very public, reorganization.[2] As a result of that reorganization, OSC suddenly lost

---

[2]   That precipitous OSC reorganization with the resultant removal or departure of so many career employees has itself been alleged to constitute the commission of prohibited personnel practices. A "Complaint of Prohibited Personnel Practices filed Against U.S. Special Counsel Scott J. Bloch" has been filed and referred for investigation to the President's Council On Integrity and Efficiency, where it is now pending. It has also been the subject of a Senate oversight hearing on May 24, 2005. *Safeguarding the Merit System: A Review of the U.S. Office of Special Counsel Before the Subcomm. on Oversight of Government Management, the Federal Workforce, and the District of Columbia of the Committee on Homeland Security and Governmental Affairs*. 109th Cong. (2005) (to be published).

many of its career staff, including <u>both</u> career attorneys working on Petitioner's case.  With the

loss of career staff and the reversal of the Special Counsel's decision to seek a stay from the MSPB

on or around February 17, the OSC appears not to have made no investigative progress on

Petitioner's allegations.  Informed of Casey's illness in early February, the OSC did not take steps

to depose Casey, presumably because by mid-March, it no longer had anyone directing the

prosecution of Petitioner's allegations. From March onward, the investigation and prosecution of

her case was left to a single career investigator.  By June 2005, Casey's unexpected rapid

deterioration made it impossible to take her deposition.

OSC's investigation into Fitzmaurice's admission to Casey has totally languished.

The U.S. Court of Appeals for the D.C. Circuit has stated, with regard to mandamus actions

affecting the Special Counsel :

> "[A]lthough the nature of the Special Counsel's inquiry is discretionary, the OSC
> cannot conduct, under the guise of an exercise of discretion, either an entirely
> inadeqaute inquiry or none at all... judicial review is available to determine whether
> the Office of Special Counsel has complied with its statutory duty to conduct an
> investigation into allegations of "prohibited personnel practices."

<u>Barnhart v. Devine</u>, *supra* at 1525 citing <u>Carducci v. Regan</u>, 714 F. 2d 171, 175 (D.C. Cir. 1983)

For all relevant purposes, the OSC's investigation into whether Fitzmaurice admitted that

his animus for the Petitioner grew out of the Petitioner's investigation of his friend and associate,

J.D. Potter, is finished.[3]  Its investigation has come to a complete halt.  Having failed to depose

Casey, it is now too late to do so.  Thus, the only relief Petitioner seeks is that the OSC either

---

[3] As a practical matter, no additional investigation can produce direct evidence of Fitzmaurice's
admission to Casey.  There were no other direct witnesses to the conversation than those two
individuals.  While the OSC could have interviewed or deposed Fitzmaurice, OSC has done
neither.  In any case, it is highly unlikely that Fitzmaurice would have admitted making that
admission to Casey.  Casey's death makes such an admission even more unlikely.

stipulate that its investigation is over and provide Petitioner with an authenticated copy of Casey's testimony or that the OSC stipulate that it will perpetuate Casey's testimony and make it available for use in appropriate judicial and quasi-judicial proceedings. Such relief is appropriately narrow and within the definition of a ministerial act. The court order sought herein would not run afoul of the nonreviewability of the *merits* of OSC's decision to conduct a thorough investigation and prosecution or the *merits* of a decision to terminate it. See <u>Wren v. MSPB</u>, 681 F. 2d 867 (D.C. Cir. 1982); <u>DeLeonardis</u>, *supra* at 726-8.

Although Ms. Casey's interview was taped, she was not given a copy of her interview. Exhibit 1, ¶ 3.[4] However, with her death, neither she, the Petitioner, nor OSC has reason to fear agency reprisal against Casey. With Casey's death, she has no privacy interest under 5 U.S.C. 55a. See 5 C.F.R. Part 1830. Moreover, her son and personal representative has made clear that it was Casey's desire to provide her testimony in Ms. Mansfield's underlying case. Exhibit 3, ¶ 4. Finally, to the extent that there is some additional reason or privilege that the OSC intends to assert with regard to Casey's statement, it has failed to do so. The Special Counsel has made no reply to Petitioner's letter asking him for such information except for sending her two nonresponsive form letters. Exhibits 5 and 6.

---

[4] Production of Casey's sworn testimony would also be consistent with OSC's ministerial functions and duties as defined by its own regulations. As part of its statutory function of investigating and prosecuting prohibited personnel practices, the OSC has adopted procedures for protecting witnesses and the ongoing investigations. Its Investigative Manual provides that the interviewed witness be placed under oath at the start of an interview and that the interview be recorded. It also provides that it provide a copy of the tape to the witness either at the time of the interview or when the investigator has completed all of the witness interviews. Office of Special Counsel, <u>Investigative Manual, Chapter 3, Part II</u> (Sept 2000) at 22, 46-47.

B.  PETITIONER MEETS ALL OF THE CONDITIONS SET FORTH IN RULE 27(a) FOR THE PERPETUATION AND PRODUCTION OF  THE TESTIMONY OF DECEDENT BARBARA CASEY.

The Fed. R. Civ.P. set forth a specific provision providing for the perpetuation of

testimony.  Rule 27 states in pertinent part:

Rule 27. Depositions Before Action or Pending Appeal

(a) Before Action.

(1) Petition

A person who desires to perpetuate testimony regarding any matter that may be cognizable in any court of the United States may file a verified petition in the United States district court in the district of the residence of any expected adverse party. The petition shall be entitled in the name of the petitioner and shall show: 1, that the petitioner expects to be a party to an action cognizable in a court of the United States but is presently unable to bring it or cause it to be brought, 2, the subject matter of the expected action and the petitioner's interest therein, 3, the facts which the petitioner desires to establish by the proposed testimony and the reasons for desiring to perpetuate it, 4, the names or a description of the persons the petitioner expects will be adverse parties and their addresses so far as known, and 5, the names and addresses of the persons to be examined and the substance of the testimony which the petitioner expects to elicit from each, and shall ask for an order authorizing the petitioner to take the depositions of the persons to be examined named in the petition, for the purpose of perpetuating their testimony

..................................................................................

(3) Order and Examination.

If the court is satisfied that the perpetuation of the testimony may prevent a failure or delay of justice, it shall make an order designating or describing the persons whose depositions may be taken and specifying the subject matter of the examination and whether the depositions shall be taken upon oral examination or written interrogatories. The depositions may then be taken in accordance with these rules; and the court may make orders of the character provided for by Rules 34 and 35.

7

(4) Use of Deposition.

If a deposition to perpetuate testimony is taken under these rules or if, although not so taken, it would be admissible in evidence in the courts of the state in which it is taken, it may be used in any action involving the same subject matter subsequently brought in a United States district court, in accordance with the provisions of Rule 32(a).

(c) Perpetuation by Action. This rule does not limit the power of a court to entertain an action to perpetuate testimony.

(F.R.C.P. 27).

Unfortunate and tragic circumstances have arisen in this case which call for the application of this Rule. While, given her untimely death, it is too late for either the Special Counsel or Petitioner to perpetuate Casey's testimony through deposition, it is not too late to perpetuate her sworn testimony. Because Casey's testimony taken under oath by a disinterested quasi-judicial third party, it is reliable evidence. The very purpose of Rule 27 is to ensure that such evidence will be available in subsequently brought court and quasi-judicial proceedings. In re Application of David J. Checkosky et al., 142 F.R.D. 4, 8-9 (D.D.C. 1992) ("purpose of Rule 27 is simply to preserve evidence that otherwise would be in danger of being lost; by granting a Rule 27 petition, the district court in no way usurps the. . . power to determine the ultimate weight and admissibility of that evidence."); Moseller v. United States, 158 F. 2d 380, 383 ( 2nd Cir. 1946) ("the present practice ...both preserves the remedy by separate action and also provides a simple method of procedure by petition in the district of the residence of any expected adverse party." ) ; Martin v. Reynolds Metals Corporation, 297 F. 2d 49, 56 (9th Cir. 1961) (Rule 27 permits discovery techniques independent of deposition); 8C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2072-4, at 664 (1994); Rules of Advisory Committee on Rules for Civil Procedure, pp. 74-5 (April 1937).

The instant Petition meets the Rule's specific requirements.

First, as previously stated, Petitioner expects to shortly refile her appeal to the MSPB of her RIF and then, if necessary, to pursue her RIF appeal in either federal district court or the Federal Circuit Court of Appeals.    Pursuant to 42 U.S.C. § 2000e-16(c), she also has an independent right to proceed to federal district court with her allegations of discrimination. Moreover, at an appropriate time and after discovery, she intends to explore her rights to file a claim against the NMB for her injuries pursuant to the Federal Torts Claims Act.  Petitioner may, in due course, bring a separate tort action against Fitzmaurice and other, yet-to-be identified, persons for violation of her civil and constitutional rights.

Second, Petitioner has met Rule 27's requirement that she show the facts which she desires to establish by the proposed testimony and her reasons for desiring its perpetuation.  It was Petitioner who identified such facts to the OSC in her May 2004 OSC complaint.  Petitioner has included, with this Petition and Motion,  affidavits from witnesses who corroborated that Casey provided a sworn statement to the OSC and which describe the content of her knowledge. Exhibits 1 and 2.[5]

Third, while Petitioner has used the word "may" throughout this motion in describing the possibility of the loss to her of Casey's testimony,  given: (1) the history of the OSC's handling of Petitioner's complaint, its arbitrary reversals, its failure to follow clear statutory mandates, and  its current failure to assure Petitioner that it will perpetuate Casey's testimony and provide it to

---

[5] Petitioner has met the Rule's requirement of identifying the known adverse parties to the underlying future litigation and their addresses – the members of the NMB in their official capacities, and, Fitzmaurice, in his official and personal capacities.  Although Petitioner does not seek a deposition, she will provide notice of this petition as required by Rule 27 to the NMB officials named in the Petition.

Petitioner necessitating the filing of this action, and, (2) the substance, relevance and materiality of Casey's testimony to the administrative and judicial actions not yet filed,  the Court should be well assured that an order to the Special Counsel requiring the perpetuation and production of such testimony will serve to prevent any further delay and failure of justice that Rule 27 seeks to ensure. See Rule 27(a)(3).

As argued above, the OSC  has effectively finished its investigation into the basis for Fitzmaurice's animus towards Petitioner.  The OSC has failed to indicate, despite Petitioner's request, whether and when it will ever release Ms. Casey's sworn testimony.  Too many signs now point to the conclusion something "may have gone fundamentally awry" and the "basic integrity of the agency proceeding" is "at issue." In re Application of David J. Checkosky at 10 *citing* Gulf Oil Corp. v. Department. Of Energy, 663 F. 2d 296 (D. C. Cir. 1981).  The specific dispute over the Special Counsel's disposition of the Casey testimony is "sufficiently urgent and the issue sufficiently joined." here. Id.

Absent an expedited Court order requiring the OSC to perpetuate and produce Casey's testimony, Petitioner may be precluded from introducing in an administrative or judicial proceeding, the direct evidence of Fitzmaurice's admission to Casey against interest and this particularly powerful evidence of his animus towards Petitioner – his specifically expressed admission of his intent to "get" Mansfield because of her role in "getting" J.D. Potter, Fitzmaurice's friend and former client, barred from Teamster office and fined.

Finally, requiring a federal investigatory agency to make immediately available the sworn testimony of a decedent witness that the government official of a second agency retaliated against Petitioner, a highly regarded federal employee, on account of the latter's former role and actions as a court-appointed elections officer undoubtedly serves the purposes of the Rule.

10

WHEREFORE, given the failure of the OSC to adequately discharge its duties in investigating and prosecuting this case, the lack of any reason for protecting Ms. Casey or her testimony, the failure of the Special Counsel to respond to Complainant's letter or otherwise assuring her that it will preserve, perpetuate, and produce Casey's statement to her, and the importance of such statement for any future judicial and quasi-judicial proceedings, and, pursuant to Fed. R. Civ.P. Rule 27 and the All Writs Act, Petitioner respectfully requests that this Court order OSC and the Special Counsel to preserve, perpetuate, and produce the original and/or authenticated copy of Ms. Casey's testimony before the OSC to this Court for its examination and to provide it to Petitioner for use in proceedings to which she is a party.

Respectfully submitted,


Beth S. Slavet, D.C. Bar 305805
Jonathan G. Axelrod, D.C. Bar 210245

Counsel for Petitioner
Beins, Axelrod, Kraft, Gleason and Gibson, P.C.
1717 Massachusetts Avenue, N.W., Room 704
Washington, D.C. 20036

11

## CERTIFICATE OF SERVICE

I certify that On this ___25th___ day of July, 2005 I served the foregoing Verified Petition for Writ of Mandamus and Verified Motion And Motion to Perpetuate and Make Available Testimony and Exhibits thereto Order, Memorandum in Support Thereof, and proposed Order, by Hand Delivery to the following:

Honorable Alberto Gonzales, Attorney General
Office of the Attorney General
950 Pennsylvania Ave., N.W.
Washington, DC 20530-0001

Civil Process Clerk
Office of the U.S. Attorney
555 Fourth Street, N.W.
Washington, DC 20001

The Honorable Scott Bloch
U.S. Office of Special Counsel
1730 M Street N.W., Ste. 218
Washington, DC 20036-4505

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BENETTA M. MANSFIELD,** ) | |
| **4025 N. Randolph Street** ) | |
| **Arlington, VA 22207** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| ) **Writ of Mandamus/Rule 27 Motion** | |
| **v.** ) | |
| ) **C.A. No.** | |
| ) | |
| **SCOTT BLOCH, Special Counsel,** ) | |
| **Office of the Special Counsel** ) | |
| **1800 M Street, N.W.** ) | |
| **Washington, D.C.  20036-4505** ) | |
| ) | |
| **Respondent** ) | |

### ORDER

Pursuant to the All Writs Act, 28 U.S.C. § 1651 (a) and FRCP 27, the Special Counsel is

hereby ORDERED to produce and provide, without further delay, an authenticated copy of the

sworn testimony of Barbara Casey, which it has in its custody  in OSC-MA-04-1921, to

Petitioner.

_____

Dated:


Notice to:    Office of the U.S. Attorney
              555 Fourth Street, N.W.

Washington, DC 20001

The Honorable Scott Bloch
Special Counsel
Office of the Special Counsel
1730 M Street, N.W. 20036-4504


Beth S. Slavet
Of Counsel
Beins, Axelrod, Kraft, Gleason & Gibson, P.C.
1717 Massachusetts Avenue, N.W., Suite 704
Washington, D.C. 20036-2001